# United States Court of Appeals

## For the Eighth Circuit

_____

No. 22-3593

_____

Associated Electric Cooperative, Inc.

*Petitioner*

v.

Federal Energy Regulatory Commission

*Respondent*

Southwest Power Pool

*Intervenor*

_____

No. 23-1285

_____

Associated Electric Cooperative, Inc.

*Petitioner*

v.

Federal Energy Regulatory Commission

*Respondent*

Southwest Power Pool

*Intervenor*

Before COLLOTON, Chief Judge, MELLOY and GRUENDER, Circuit Judges.
_____

MELLOY, Circuit Judge.

During Winter Storm Uri, weather-related electricity shortages caused Southwest Power Pool, Inc. ("Southwest") to contact Associated Electric Cooperative, Inc. ("the Cooperative") to purchase emergency energy. The Cooperative provided Southwest with emergency energy, and afterwards, Southwest provided the Cooperative with payment in accordance with the parties' existing written contract and the rates on file with the Federal Energy Regulatory Commission ("FERC"). The Cooperative claimed that Southwest's payment was insufficient and not in accordance with a separate oral agreement Cooperative personnel had entered into with Southwest personnel during Winter Storm Uri. Southwest refused to pay more than the rate in the written contract, and thereafter, the Cooperative brought suit in federal district court, claiming state law breach of contract and equitable claims.

Before the district court made any determinations, Southwest petitioned FERC for a declaratory order that the agency had primary jurisdiction over the contract dispute and that Southwest had properly compensated the Cooperative for the emergency energy transaction in accordance with the filed rate. FERC agreed that it had primary jurisdiction over the emergency energy transaction and that Southwest had appropriately compensated the Cooperative. The Cooperative now

petitions for review of FERC's Order (No. 22-3593) and denial of rehearing (No. 23-1285).[1] We deny the Cooperative's petitions for review.

I.

This case arises out of a contract dispute between the Cooperative and Southwest regarding which agreement controls the price of emergency energy sales made by the Cooperative to Southwest during Winter Storm Uri. Southwest is a regional transmission organization and public utility. 16 U.S.C. § 824(e). "Regional transmission organization" is a technical name for regulated organizations within FERC's jurisdiction that manage bulk energy transmission operations, ensure equitable and reliable energy transmission, balance energy distribution among market participants, and oversee the markets where energy transactions take place. 18 C.F.R. § 35.34. As a regional transmission organization, Southwest does not generate or consume power but rather facilitates the buying and selling of power through its Integrated Marketplace, an energy marketplace administered by Southwest.

Pursuant to the Federal Power Act ("FPA"), Southwest's Integrated Marketplace is within the jurisdiction of FERC. *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 154–55 (2016) (citing 16 U.S.C. §§ 824, 824d). In the Integrated Marketplace, Southwest manages real-time transfers of energy and is required to coordinate transmission service among market participants in an efficient and nondiscriminatory manner. 18 C.F.R. § 35.34(j)–(k). Power producers that buy and sell electricity in the Integrated Marketplace are referred to as "market participants." Market participants include both public and private utilities. The FPA requires Southwest and market participants to enter into agreements called "tariffs," which are filed with FERC. *Id.* § 35.28(c); 16 U.S.C. § 824d(a), (c). Tariffs are complex

---

[1]The Cooperative also appeals the district court's dismissal of the Cooperative's case for failure to state a claim, which we today affirm in *Associated Elec. Coop., Inc. v. Sw. Power Pool*, Nos. 23-1293, 23-2627, --- F.4th --- (8th Cir. Aug. 5, 2024).

contracts that must include "a statement of (1) electric service . . . offered on a generally applicable basis, (2) rates and charges for or in connection with that service, and (3) all classifications, practices, rules, or regulations which in any manner affect or relate to the aforementioned service, rates, and charges." 18 C.F.R. § 35.2(c)(1). Tariffs must be filed with FERC. *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527, 531 (2008) (citing 16 U.S.C. § 824d(c)). Additionally, the rates and charges for electric service included in the tariff must be "just and reasonable." 16 U.S.C. § 824d(a). After agency approval, tariffs control the terms and prices of energy sales, and "[u]tilities wishing to change their tariffs must notify the Commission 60 days before the change is to go into effect." *Id.* (citing 16 U.S.C. § 824d(c)–(d)).

The Cooperative is a power utility comprised of member cooperatives that generate and transmit energy. The Cooperative is generally not subject to FERC's jurisdiction as it is not considered a public utility. 16 U.S.C. § 824(a), (e). However, the Cooperative is a market participant in Southwest's Integrated Marketplace, which allows the Cooperative to buy and sell energy in the Integrated Marketplace. To become a market participant in Southwest's Integrated Marketplace, the Cooperative entered into a Market Participant Agreement,[2] which requires the Cooperative to register as a market participant and incorporates by reference all terms and conditions in the Southwest-Cooperative Tariff ("Tariff"), including rates. By entering into the Market Participant Agreement and Tariff and filing them with FERC, the Cooperative agreed to be subject to FERC's jurisdiction as it applied to the Integrated Marketplace and the Tariff. The Cooperative and Southwest also entered into a separate Joint Operating Agreement.

The Tariff is a long and complex contract that is comprised of multiple sections called "attachments." Relevant here is Attachment AE, which sets forth the terms for both parties as participants in the Integrated Marketplace. By signing the

---

[2]The formal name of the agreement is the Market Participant Service Agreement Between Southwest Power Pool, Inc. and Associated Electric Cooperative, Inc. – Power Market.

Market Participant Agreement, the Cooperative bound itself to the terms of Attachment AE. Section 6.6 of Attachment AE sets forth emergency energy assistance protocols for Southwest and the Cooperative in their roles as "balancing authorities." As balancing authorities, the Cooperative and Southwest are each "responsible for balancing load, generation, and net interchange." Fed. Energy Regul. Comm'n, Off. of Energy Pol'y & Innovation, *Energy Primer: A Handbook for Energy Market Basics* 54 n.112 (2023). In their roles as balancing authorities, the Cooperative and Southwest maintain supply and demand balance within their defined boundaries, while also working together and with other adjacent balancing authorities to ensure energy reliability. Section 6.6 of Attachment AE states that Southwest "may request emergency energy assistance from an adjacent balancing authority," like the Cooperative, and likewise that the Cooperative "may request emergency energy assistance from the [Southwest] Balancing Authority." Section 6.6 also states that prices for emergency energy will be the same as other import and export energy rates, as determined by the rates on file in the Tariff, unless Southwest and the Cooperative include terms in their Joint Operating Agreement that specify "additional market-related charges or credits for the provision of emergency energy assistance."

As stated, in addition to the Market Participant Agreement and the Tariff, the Cooperative and Southwest also executed the Joint Operating Agreement. The purpose of the Joint Operating Agreement "is to coordinate data exchange, planning, scheduling and other aspects of transmission operations and planning." Article Six of the Joint Operating Agreement addresses "emergency operating principles" that the parties agreed to follow when faced with emergency energy situations. Specifically, Article Six states that where either the Cooperative or Southwest declares an emergency, the parties "shall coordinate respective actions to provide immediate relief until" the emergency is over. At the time of Winter Storm Uri, the Joint Operating Agreement did not specify charges or credits in the event of emergency energy assistance.

Winter Storm Uri brought unusually cold weather that impacted Southwest's service area. As a result, Southwest needed emergency energy assistance from the Cooperative to ensure energy reliability and transmission to the impacted areas. According to the Cooperative, over the course of a series of recorded phone calls, Southwest balancing authority operators reached out to the Cooperative's balancing authority operators for emergency energy assistance. The Cooperative asserts that its operators received verbal assurances that the Cooperative would not incur a financial detriment by providing emergency energy assistance. Thereafter, the Cooperative provided emergency assistance by selling power into the Southwest real-time balancing market.

After the emergency energy transaction, Southwest sent the Cooperative a payment of approximately $29 million, pursuant to the regular import and export schedules provided in Section 6.6 of Attachment AE of the Tariff. The parties agreed that Southwest's payment was consistent with the Tariff's rate. However, the Cooperative argued that Southwest erred in applying the regular import and export schedules because the emergency energy transaction was subject to an oral agreement and outside the scope of the Tariff and Market Participant Agreement. The Cooperative argued that under the oral agreement, Southwest instead should have paid $58.8 million for the emergency energy transaction. Southwest refused to pay more than the rate agreed to in the Tariff.

Thereafter, the Cooperative brought suit in federal district court alleging breach of contract and seeking state law equitable relief. While the Cooperative's complaint was pending, Southwest petitioned FERC for a declaratory order pursuant to 18 C.F.R. § 385.207, asking the agency to exercise exclusive or primary jurisdiction over the emergency energy transaction and to determine which agreement controlled. FERC determined it had primary, not exclusive, jurisdiction. FERC also concluded that the emergency energy transaction was controlled by the terms of the Tariff, and therefore, Southwest appropriately compensated the Cooperative pursuant to the rate on file with the agency. After FERC issued its Order, the Cooperative petitioned the agency for rehearing, which FERC denied.

The Cooperative now petitions for review of FERC's declaratory order and denial of rehearing. We deny the petitions for review.

## II.

As a threshold issue, the parties dispute which contract governs the emergency energy transaction. The Cooperative argues that the emergency energy transfer was subject to the terms of an oral contract it entered into with Southwest. Specifically, the Cooperative asserts that Southwest's balancing authority personnel entered into an oral contract with the Cooperative's balancing authority personnel. As such, the Cooperative argues that this is a standard breach of contract case that belongs in district court. FERC and Southwest,[3] on the other hand, urge this Court to adopt FERC's conclusion that the emergency energy transaction was made pursuant to the Tariff. We will deny a petition for review of the agency's order unless the agency's conclusions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Mid-Continent Area Power Pool v. FERC*, 305 F.3d 780, 782 (8th Cir. 2002) (quoting 5 U.S.C. § 706(2)(A)).

Years prior to Winter Storm Uri, the Cooperative voluntarily entered into the Joint Operating Agreement, and Article Six of the Agreement requires Southwest and the Cooperative to "coordinate respective actions to provide immediate relief until the declaring Party eliminates the declaration of emergency." Furthermore, the Cooperative voluntarily entered into the Market Participant Agreement with Southwest so that the Cooperative could buy and sell energy in Southwest's Integrated Marketplace. The Market Participant Agreement applies to transactions between the Cooperative and Southwest in the Integrated Marketplace, and it incorporates the Tariff. Attachment AE of the Tariff, which sets the terms of the Integrated Marketplace, includes Section 6.6, a provision controlling emergency energy transactions between balancing authorities. Section 6.6 states in relevant part:

---

[3]Southwest joined this suit as an intervenor.

The definition of emergency energy and the procedures for emergency energy assistance between the [Southwest] Balancing Authority and an adjacent balancing authority will be pursuant to the applicable joint operating agreement.

Import or export schedules related to emergency energy assistance will be settled similar to all other import or export schedules. The joint operating agreements may include market-related charges or credits for the provision of emergency energy assistance.

According to the second paragraph, the Cooperative and Southwest could have specified in their Joint Operating Agreement additional charges for emergency energy. At the time of Winter Storm Uri, however, the parties' Joint Operating Agreement did not include such a provision.

The Cooperative argues that Section 6.6 did not control the emergency energy transaction; rather, Cooperative and Southwest "balancing authority personnel" entered into an oral agreement outside of the Tariff and Market Participant Agreement. The Cooperative's primary argument is that the Winter Storm Uri transaction was part of its "balancing authority function," as opposed to its "power marketing function." The Cooperative cites the fact that Southwest's balancing authority personnel "made direct requests for power to" the Cooperative's own balancing authority personnel. The Cooperative further argues that because personnel from its "power marketing function" executed the Market Participant Agreement and Tariff, Section 6.6 of Attachment AE does not apply to transactions entered into by personnel from its "balancing authority function." The Cooperative further distinguishes "power marketing" from "balancing authority" "functions" by explaining that, although the "power marketing function does, at times, transact in the Integrated Marketplace pursuant to the Market Participation Agreement," it does so by voluntarily "bidding in generation it has to sell or by entering day-ahead or real-time purchases." The Cooperative asserts that because personnel from its "power marketing function" never entered the market to sell emergency power to Southwest, the Market Participation Agreement does not apply. Thus, the Cooperative reasons, because balancing authority personnel at the Cooperative and

Southwest communicated regarding the emergency energy transaction, the transaction was made outside the four corners of the Tariff and the Market Participant Agreement such that the Tariff does not apply to the rates for the emergency energy transaction.

We are not convinced by the Cooperative's argument, which mischaracterizes the nature of its organization and the applicability of the Tariff by creating artificial distinctions. The Cooperative provides no authority or documentation to support its position. It provides nothing to show the existence of a legal or formal distinction between its "balancing authority function" and "power marketing function." Furthermore, the Cooperative cites no contract provisions or legal authority to support its argument that the balancing authority and power market "functions"—which FERC and Southwest argue simply mean personnel—were subject to separate agreements. Finally, it is confusing why, if the power market and balancing authority "functions" were separate, the Market Participant Agreement would include a provision expressly addressing emergency assistance from adjacent balancing authorities. The Cooperative does not answer this question.

FERC concluded that the Market Participant Agreement and Tariff controlled the emergency energy transaction. FERC further determined that, because the Joint Operating Agreement included no specified payment plan for emergency energy, the default energy prices were the rates on file with FERC, which control absent 60 days' prior notice to the agency of a plan to change rates. 16 U.S.C. § 824d(d). Reviewing FERC's determination under either a de novo or arbitrary and capricious standard of review, we agree that the Tariff, Market Participant Agreement, and Joint Operating Agreement controlled the emergency energy transaction. Therefore, we reject the Cooperative's argument that the transaction was subject to a separate oral agreement.

We next consider whether FERC properly assumed primary jurisdiction to resolve the issue of whether Southwest, pursuant to Attachment AE of the Tariff, appropriately compensated the Cooperative for the emergency energy. Primary jurisdiction "is a common law doctrine used to coordinate administrative and judicial decisionmaking." *Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir. 1988); *see also City of Osceola, Ark. v. Entergy Ark., Inc.*, 791 F.3d 904, 908–09 (8th Cir. 2015). "The doctrine of primary jurisdiction applies to claims 'properly cognizable in court that contain some issue within the special competence of an administrative agency.'" *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 909 (8th Cir. 2015) (citation omitted). When a court and agency have concurrent jurisdiction over an issue, as with contract interpretation, courts will defer to agencies' primary jurisdiction because "judges, who usually deem themselves to be relatively the generalists, should not act on a question until the administrators, who may be relatively the specialists, have acted on it." *Barlow*, 846 F.2d at 476 (citation omitted); *Entergy Ark., Inc.*, 791 F.3d at 908 ("[I]ssues of interpretation of a contract on file with the Commission are within the Commission's concurrent jurisdiction with the courts." (citation omitted)).

"There is no 'fixed formula' for deciding whether an agency has primary jurisdiction over a case; instead courts consider whether 'desirable uniformity' would result from an agency determination and whether 'the expert and specialized knowledge' of the agency is needed." *Entergy Ark., Inc.*, 791 F.3d at 909 (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956)). When determining whether to exercise primary jurisdiction, FERC applies the "*Arkla* factors." *Ark. La. Gas Co. v. Hall*, 7 F.E.R.C. ¶ 61,175, 61,322 (1979); *see also Entergy Ark., Inc.*, 791 F.3d at 909. The factors include:

> (1) whether the Commission possesses some special expertise which makes the case peculiarly appropriate for Commission decision; (2) whether there is a need for uniformity of interpretation of the type of

question raised by the dispute; and, (3) whether the case is important in relation to the regulatory responsibilities of the Commission.

*Entergy Ark., Inc.*, 791 F.3d at 909 (quoting *Ark. La. Gas Co.*, 7 F.E.R.C. at 61,322); *see also Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 938 (8th Cir. 2005).

In deciding to exercise primary jurisdiction, FERC found that all the *Arkla* factors were present. First, FERC determined it had special expertise to resolve disputes that involved compensation for emergency energy transactions, the Southwest-Cooperative Tariff and Joint Operating Agreement, the requirements of the FPA, and the filed rate doctrine, discussed below. FERC next found that exercise of primary jurisdiction was appropriate because "there is a need for uniformity, both across [Southwest] and across the industry as [a] whole, in interpreting the question raised in the dispute," specifically the applicability of the filed rate doctrine. Finally, FERC explained that resolving the dispute between the Cooperative and Southwest was important to its FPA regulatory responsibilities to "ensure that the rates, terms, and conditions of wholesale electric energy sales are just and reasonable and consistent with the rate on file with the Commission." FERC concluded, "If these types of compensation disputes for jurisdictional wholesale sales are raised in other forums, it runs the risk of undermining the Commission's enforcement of these obligations." Thus, FERC found the exercise of primary jurisdiction appropriate.

The Cooperative argues that it should not be subject to FERC's jurisdiction because it is a private rural electric cooperative and not a public utility. FERC and Southwest agree that the Cooperative "generally is not subject to the Commission's rate jurisdiction under the FPA." Nonetheless, the Cooperative is a signatory to the Tariff, Market Participant Agreement, and Joint Operating Agreement, which are all subject to FERC's jurisdiction. *See Alliant Energy v. Neb. Pub. Power Dist.*, 347 F.3d 1046, 1050 (8th Cir. 2003) ("When a contract provides that its terms are subject to a regulatory body, all parties to that contract are bound by the actions of the regulatory body."). The Cooperative next contends that FERC's assumption of primary jurisdiction was inappropriate by portraying the agreement with Southwest

-11-

as an oral contract. But as we have already explained, the emergency energy transaction was subject to the Tariff and not an oral agreement.

The Cooperative further argues that FERC's exercise of primary jurisdiction was inappropriate because this dispute is better suited to generalist judges. We disagree. Given the complexity of this material, and the fact that both Southwest and the Tariff are within FERC's jurisdiction, it makes sense that the agency would exercise primary jurisdiction over this dispute. Indeed, we have previously explained that

> "[W]here words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application, so that the inquiry is essentially one of fact and of discretion in technical matters, then the issue of tariff application must first go" to the administrative agency.

*Entergy Ark., Inc.*, 791 F.3d at 909 (quoting *W. Pac. R.R. Co.*, 352 U.S. at 66). Here, the need for uniformity is essential. If the court allowed oral agreements to supersede tariffs, there would be market-wide contract disputes. Accordingly, we find that FERC properly exercised primary jurisdiction.

IV.

The Cooperative next argues that FERC erred in concluding that the filed rate doctrine applied to the emergency energy transaction with Southwest. "Under the filed rate doctrine, no seller of energy may collect a rate other than the one filed with and approved by FERC, and no court may substitute its own judgment for that of FERC." *Entergy Ark., Inc.*, 791 F.3d at 908. Indeed, "when there is a conflict between the filed rate and the contract rate, the filed rate controls." *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 582 (1981). Furthermore, "[t]he 'filed rate doctrine' forbids a regulated entity from charging a rate for its services other than the rate on file with the appropriate regulatory authority." *Crumley v. Time Warner Cable, Inc.*, 556 F.3d

-12-

879, 881 (8th Cir. 2009). Under the FPA, "FERC itself lacks authority to alter filed rates retroactively." *Entergy Ark., Inc.*, 791 F.3d at 908. If FERC "finds a filed rate to be unreasonable, it only has statutory authority to impose a new rate prospectively." *Id.*

The Cooperative puts forth a number of reasons why FERC erred in applying the filed rate doctrine, none of which we find convincing. First, the Cooperative argues that the filed rate does not apply because it is a private utility and therefore not subject to FERC's jurisdiction. As discussed above, however, the Tariff, and transactions made pursuant to the Tariff, are subject to FERC's jurisdiction. *Neb. Pub. Power Dist.*, 347 F.3d at 1050. The Cooperative next asserts that, given the costs it bore during Winter Storm Uri, applying the filed rate to the emergency energy transaction is unjust. But the filed rate doctrine "is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination." *Am. Tel. & Tel. Co. v. Cent. Off. Tel., Inc.*, 524 U.S. 214, 222 (1998) (quoting *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915)). Indeed, even "[i]gnorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed." *Id.* (quoting *Louisville & Nashville R.R. Co.*, 237 U.S. at 97).

Lastly, the Cooperative argues that FERC erred in applying the filed rate because neither Southwest nor the Cooperative have a filed rate "applicable to Associated Electric's emergency power sales." But this ignores the contractual language of Attachment AE Section 6.6, which states that "[i]mport and export schedules related to emergency energy assistance will be settled similar to all other import or export schedules" but that the "joint operating agreement[] may include additional market-related charges or credits for the provision of emergency energy assistance." As FERC explained, silence in the Joint Operating Agreement meant that the default Tariff rate applied.

Because the Joint Operating Agreement at the time did not provide for emergency energy charges and credits, the rate on file constitutes the price of energy pursuant to the Tariff. Accordingly, reviewed de novo or under an arbitrary and capricious standard, we conclude that FERC appropriately applied the filed rate doctrine to the emergency energy sales. The parties agree that Southwest compensated the Cooperative at the filed rate, and as such, Southwest did not breach its contract.[4]

V.

The Southwest-Cooperative Tariff governs this emergency energy dispute. As such, we conclude that FERC properly asserted primary jurisdiction and applied the filed rate to the emergency energy sales. Accordingly, Southwest did not breach its contractual obligations when it compensated the Cooperative in accordance with the filed rate for the emergency energy transaction.

For the foregoing reasons, we deny the petitions for review.

GRUENDER, Circuit Judge, concurring.

The court applies the familiar arbitrary-and-capricious standard in denying the Cooperative's petitions for review. *See* 5 U.S.C. § 706(2)(A). But the court also reviews the FERC orders *de novo* for the purpose of rejecting the Cooperative's arguments in the companion case. *See Associated Elec. Coop. v. Sw. Power Pool*, Nos. 23-1293, 23-2627, --- F.4th --- (8th Cir. Aug. 5, 2024). With the understanding

---

[4]The Cooperative also argues that "FERC's arbitrary application of the [Southwest] filed-rate to sales [has] resulted in a confiscatory taking in violation of section 205 of the Federal Power Act." FERC concluded that the Cooperative waived this argument when it failed to raise the issue until its request for agency rehearing. FERC's determination was neither arbitrary nor capricious. Moreover, on petition for review, the Cooperative does not seriously argue this point and fails to provide legal authority to support its position.

that it does so only for the sake of argument, I concur.  *See id.* at --- (Gruender, J., concurring).

_____