Mary H. BENDZAK, individually and on behalf of all others similarly situated, Plaintiff,

v.

MIDLAND NATIONAL LIFE INSURANCE COMPANY, Defendant.

No. 4:05–CV–00649.

United States District Court, S.D. Iowa, Central Division.

July 27, 2006.

Steve W. Berman, Hagens Berman Sobol Shapiro LLP, Seattle, WA, Elizabeth A. Fegan, Timothy A. Scott, Hagens Berman Sobol Shapiro LLP, Chicago, IL, J. Barton Goplerud, Michael Mallaney, Hudson Mallaney & Shindler PC, West Des Moines, IA, for Plaintiff.

Randall G. Horstmann, Nyemaster Goode West Hansell & O'Brien, PC, Des Moines, IA, Linda B. Oliver, Robert D. Phillips, Jr., Marshall C. Wallace, Reed Smith LLP, Oakland, CA, for Defendant.

## ORDER

PRATT, Chief Judge.

Before the Court is Defendant's Motion to Dismiss or Stay Proceedings and Alternative Motion to Strike Claims Barred by the Statute of Limitations (Clerk's No. 14), filed on March 10, 2006. Plaintiff filed a Resistance (Clerk's No. 24) on April 26, 2006, and Defendant filed a Reply (Clerk's No. 25) on May 3, 2006. The matter is fully submitted.

## I. FACTS

Marie H. Bendzak ("Bendzak") filed a Class Action Complaint (Clerk's No. 1) in this Court on December 8, 2005. Bendzak is a senior citizen who purchased eight deferred annuity policies from Defendant, Midland National Life Insurance Company ("Midland"), between April 2001 and January 2002. Compl. ¶ 6. The premiums for the policies totaled more than $200,000. *Id.* Bendzak purchased the policies through Cleveland Senior's Financial Services ("Cleveland Senior's"), a licensed agent of Midland. Cleveland Senior's is not currently a party to this lawsuit, but Bendzak states in her Complaint that she may amend it at a future date to name "additional parties of interest." Compl. ¶¶ 8, 9.

Bendzak claims that high surrender charges make deferred annuities an inappropriate product for senior citizens. A deferred annuity differs from a traditional annuity in that the purchaser of a deferred annuity does not receive payments immediately after purchasing the annuity. Instead, the purchaser begins receiving payments after the annuity has matured, typically years later. *See* Compl. ¶¶ 11–13; *see also Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 104 (2d Cir.2001). Typically, deferred annuities are subject to high surrender charges if the purchaser seeks to withdraw money before the annuity has matured. *See id.* ¶ 13. When Bendzak purchased eight deferred annuities from Midland, she was 82 and 83 years old. *Id.* ¶ 21. The annuities will not mature until 2018 and 2019, when Bendzak will be 100 and 101 years old. *Id.* In Bendzak's terms, this is "well beyond her actuarial life expectancy." *Id.* Bendzak states that she cannot access "the vast amount of money held in the annuities for housing costs or general health care [for] the first fourteen years of the annuities without incurring substantial surrender changes as high as 25%." *Id.* ¶ 22.

Bendzak filed this action on behalf of a proposed nationwide class consisting of:

All persons in the United States who have incurred, or could possibly incur, a surrender charge, whether upon surrender or a death benefit claim, under a Midland deferred annuity policy issued where the annuitant or owner was over the age of 65 at the time of sale, and where the date that the distribution pay-

ments from the annuity commences is beyond the annuitant's actuarial life expectancy.

Compl. ¶ 23. Bendzak claims that Midland's marketing and sales practices were illegal with respect to the deferred annuities. Bendzak's Complaint contains three counts. In Count One, Bendzak claims that Midland violated the provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. In Count Two, Bendzak claims that Midland engaged in common law civil conspiracy under Iowa and other states' laws. And in Count Three, Bendzak claims that Midland has been unjustly enriched through the wrongful collection of premiums, penalties, and surrender charges relating to its deferred annuity plans.

## II. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Bendzak alleges that some members of the proposed class are citizens of different states than the Defendant, and that the amount in controversy exceeds $5,000,000, making federal jurisdiction proper pursuant to 28 U.S.C. § 1332(d) as well. Midland's principal offices are located in Sioux Falls, South Dakota, but its annuity division operations are located in West Des Moines, Iowa. Bendzak alleges that the acts giving rise to her claims occurred in the Southern District of Iowa, making venue proper under 28 U.S.C. § 1391(b).

## III. STANDARD FOR MOTION TO DISMISS

When ruling on a motion to dismiss, the Court must "accept the allegations con-

tained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Coons v. Mineta,* 410 F.3d 1036, 1039 (8th Cir.2005). The Court applies a stringent standard to a Rule 12(b)(6) motion to dismiss, and "[a] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 545–46 (8th Cir. 1997) (quoting *Fusco v. Xerox Corp.,* 676 F.2d 332, 334 (8th Cir.1982) (citation omitted)). Accordingly, a motion to dismiss will be granted "only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Id.* at 546.

## IV. LAW & ANALYSIS

Midland argues that Bendzak's Complaint should be dismissed, partially dismissed, or stayed for four different reasons.[1] First, Midland argues that the case should be dismissed because adjudication of Bendzak's claims in federal court would improperly interfere with state insurance regulation. Second, Midland argues that Bendzak's Complaint must be dismissed with respect to seven of the eight annuities she purchased because the statute of limitations has run for her claims relating to those annuities. Third, Midland contends that Bendzak has failed to state a claim upon which relief can be granted under RICO because she has not alleged facts that, if proved, would satisfy the elements of a RICO claim. Finally, Midland argues that Bendzak's claim for common law civil conspiracy must fail because she has not alleged a viable underlying wrong. Def.'s

---

1. Although Bendzak filed her claim as a class action, she has not yet filed a motion for class certification. Accordingly, the Court will consider only Bendzak's allegations for the

purpose of deciding this motion to dismiss. *See Cunningham v. PFL Life Ins. Co.,* 42 F.Supp.2d 872, 878 n. 1 (N.D.Iowa 1999).

Br. in Supp. of Mot. to Dismiss at 2. Each of Midland's arguments is discussed below.

### A. Interference with State Insurance Regulation

Midland contends that Bendzak's Complaint should be dismissed because adjudication of her claim in federal court would improperly interfere with state insurance regulation. Midland first cites the McCarran–Ferguson Act (the "Act"), 15 U.S.C. § 1011 et seq., stating that the Act dictates that annuities "are subject to state, not federal, regulation." Def.'s Br. in Supp. of Mot. to Dismiss at 7. Midland next argues that the case should be dismissed pursuant to the primary jurisdiction doctrine because resolution of Bendzak's claims would undermine established state administrative regulations. In the alternative, Midland argues that the Court should abstain pursuant to the doctrine established by the Supreme Court in *Burford v. Sun Oil Company*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Each of these arguments is addressed in turn.

### 1. McCarran–Ferguson Act.

■ Midland points to the McCarran–Ferguson Act, 15 U.S.C. § 1011 et seq., and states that the Act indicates that annuities, which are insurance contracts, are subject to state, not federal, regulation.[2] The Act states, in relevant part: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). In *Humana Inc. v. Forsyth*, the Supreme Court considered whether the McCarran–Ferguson Act precluded a RICO claim

brought by a group of plaintiffs who held health insurance policies issued by Humana. 525 U.S. 299, 303, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999). The Court held that the Act did not preclude the plaintiffs' claim, concluding that RICO's private right of action and treble damages provision complemented the Nevada statutory scheme at issue. *Id.* at 313–14, 119 S.Ct. 710. In the absence of any assertion that allowing Bendzak's RICO claim to proceed in this case would interfere with a state regulatory scheme in some way that the RICO claim in *Humana* did not, the Court concludes that the McCarran–Ferguson Act is not a ground for dismissal in this case.

### 2. Primary jurisdiction doctrine.

■ Midland argues that the Court should dismiss Bendzak's action because it "represents an attempt to re-legislate a subject matter that has already been the subject of careful policymaking by state legislators and state insurance regulators." Def.'s Br. in Supp. of Mot. to Dismiss at 7. Specifically, Midland contends that the annuities that Bendzak purchased are insurance contracts that are regulated under Ohio law because Bendzak is an Ohio citizen who purchased the annuities from an Ohio broker. Accordingly, Midland argues, the Court should dismiss or stay Bendzak's claims because hearing the case would interfere with work that should be left to the Ohio Department of Insurance.

■ The primary jurisdiction doctrine is a common law doctrine that is "concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. W.*

---

2. Despite citing the McCarran–Ferguson Act, Midland does not appear to assert that the Act itself is grounds for dismissal. Nonetheless, the Act deserves brief discussion in light of its relevance to the issues in this case and in light of Bendzak's discussion of it in her Resistance.

*Pac. R.R. Co.,* 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). The primary jurisdiction doctrine allows a federal district court to refer a claim to an appropriate administrative agency. *See Great Plains Coop v. Commodity Futures Trading Comm'n,* 205 F.3d 353, 355 (8th Cir. 2000). The doctrine promotes uniformity and consistency, as well as the optimal use of an agency's expertise and experience. *United States v. Henderson,* 416 F.3d 686, 691 (8th Cir.2005). The doctrine is invoked sparingly because it often leads to additional expense and delay. *Alpharma, Inc. v. Pennfield Oil Co.,* 411 F.3d 934, 938 (8th Cir.2005).

■ There is no fixed formula for applying the primary jurisdiction doctrine. In each case, the Court must consider whether the reasons for the doctrine are present and whether application of the doctrine would promote the purposes for which the doctrine was created. *Id.* In examining these questions, a court may consider whether the legal question is of a nature that requires the benefit of agency expertise, or if it is a question that falls within the "conventional experience of judges." *Id.* (citation omitted). Midland argues that the Ohio Legislature and the Ohio Department of Insurance have "comprehensively legislated and regulated deferred annuity contracts in Ohio," and that Bendzak's action would interfere with the regulatory structure that is already in place. Def.'s Br. in Supp. of Mot. to Dismiss at 9. Bendzak, on the other hand, contends that her claim is not about an insurance regulatory matter, but rather is about whether Midland illegally engaged in a scheme to market annuities to seniors. Pl.'s Resistance Br. at 8.

In her Resistance to Midland's Motion to Dismiss, Bendzak points to cases from Iowa and Ohio holding that the primary jurisdiction doctrine should not apply in the insurance context where the "outcome will depend on application of common-law corporate tort concepts, not the expertise of the insurance industry." *Rowen v. LeMars Mut. Ins. Co.,* 230 N.W.2d 905, 912 (Iowa 1975); *see also Zangara v. Travelers Indem. Co. of Am.,* 423 F.Supp.2d 762, 776 (N.D.Ohio 2006) (holding that Ohio Superintendent of Insurance did not have primary jurisdiction where plaintiff brought common law claims for fraud and unjust enrichment), *vacated on other grounds by Zangara v. Travelers Indem. Co. of Am.,* No. 1:05–cv–731, 2006 WL 825231 (N.D.Ohio Mar. 30, 2006). The Sixth Circuit reached a similar conclusion in a case involving an insurance-related RICO claim, noting that "claims based on fraud and deceit do not require agency expertise for their treatment because such claims are within the conventional expertise of judges." *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio,* 900 F.2d 882, 889 (6th Cir.1990).

As discussed above, Bendzak's Complaint contains three counts: (1) violations of RICO, (2) common law civil conspiracy, and (3) unjust enrichment. In support of her RICO claim, Bendzak alleges predicate acts of mail fraud and wire fraud. Compl. ¶ 38. All of these claims are claims that are within the conventional expertise of judges, and none of them require the special expertise of a state insurance commission. While it is true that the Ohio Legislature and the Ohio Department of Insurance have established a thorough regulatory scheme for the insurance industry in Ohio, this fact alone does not mean that the Court should transfer jurisdiction to the state administrative body. Because Bendzak's claims are "within the conventional expertise" of federal district courts, the Court declines to dismiss or stay the action under the primary jurisdiction doctrine. *See id.*

### 3. Burford *Abstention.*

Midland next argues that the Court should abstain pursuant to the doctrine articulated by the Supreme Court in *Burford v. Sun Oil Company,* 319 U.S. at 318, 63 S.Ct. 1098. In *Burford,* the Supreme Court examined whether a federal district court should have abstained from deciding a case that implicated complex state administrative procedures for the conservation of oil and gas in Texas. *Id.* The Court held that the district court should have abstained, explaining that "[c]onflicts in the interpretation of state law, dangerous to the success of state policies, are almost certain to result from the intervention of the lower federal courts." *Id.* at 334, 63 S.Ct. 1098. In subsequent cases explaining the doctrine that is now known as *Burford* abstention, the Supreme Court has indicated that federal courts sitting in equity should defer to state administrative procedures under the following circumstances:

> (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) ("NOPSI") (quoting *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)).

■ A critical limitation of *Burford* abstention is that it applies only in cases where the relief sought is in the form of injunctive or declaratory relief. *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 731, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996). In *Quackenbush,* the Supreme Court considered whether abstention could be invoked in an action for monetary damages. The Court concluded that *Burford* abstention is not appropriate in an action for monetary damages, observing that, in previous cases, the Court "recognized that the authority of a federal court to abstain from exercising its jurisdiction extends to all cases in which the court has *discretion* to grant or deny relief." *Id.* at 718, 116 S.Ct. 1712 (emphasis added). Accordingly, the Court held that "federal courts have the power to dismiss or remand cases based on abstention principles only where the relief being sought is equitable or otherwise discretionary." *Id.* at 731, 116 S.Ct. 1712. The Court also reiterated its previous observation that courts should only decline to exercise their discretion in "exceptional circumstances." *Id.* at 716, 116 S.Ct. 1712.

■ Here, Bendzak requests relief in the form of compensatory damages, consequential and incidental damages, interest, and punitive damages. *See* Compl. at p. 20. The only equitable relief Bendzak requests is the imposition of "a constructive trust and equitable lien ... against all money paid to and/or wrongfully withheld by the Defendant." *Id.* The purpose of this request is clearly to secure any monetary relief that Bendzak is awarded in the event that she prevails in her claims. Because Bendzak's action is for damages, the Court cannot invoke *Burford* abstention in this case. *See Quackenbush,* 517 U.S. at 731, 116 S.Ct. 1712.

### B. *Statutes of Limitations*

Midland next argues that Bendzak's RICO and conspiracy claims, as they relate to the first seven annuity contracts that she purchased, are barred by the applicable statutes of limitations. Bendzak alleges that she purchased eight deferred annuity policies, with initial premi-

ums exceeding $200,000, between April 2001 and January 2002. Compl. ¶ 6. Midland contends that the statutes of limitations for seven of the eight policies expired before Bendzak filed her Complaint on December 8, 2005.

### 1. *Statute of limitations for Bendzak's RICO claim.*

Midland contends that Bendzak's RICO claim is time-barred as to the first seven of the eight annuities that she purchased. Although Bendzak's Complaint does not state the exact dates on which she purchased each policy, Bendzak does not dispute Midland's contention that she purchased seven of the policies before December 2001. Copies of the policies, attached to Midland's Motion to Dismiss, indicate that Bendzak purchased the eight policies on the following dates: April 24, 2001, May 25, 2001, May 31, 2001, July 3, 2001, July 6, 2001, November 5, 2001, November 5, 2001, and January 10, 2002.[3] The statute of limitations for a civil RICO action is four years, as is discussed in detail below. *Agency Holding Corp. v. Malley–Duff & Assoc., Inc.*, 483 U.S. 143, 152, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). Thus, if the statute of limitations began to run on the date of purchase, Bendzak's claim would be time-barred as to the first seven policies. Bendzak contends that the Court should toll the statute of limitations "pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment." Compl. ¶ 60. Bendzak's arguments are based in her contention that Midland committed mail fraud and wire fraud in the marketing and sale of

the deferred annuities, and that the alleged fraud is reason to toll the statute of limitations.

▮ RICO does not provide an express statute of limitations for civil enforcement actions. *Malley–Duff*, 483 U.S. at 146, 107 S.Ct. 2759. In *Malley–Duff*, the Supreme Court "borrowed" the four-year statute of limitations from the Clayton Act, 15 U.S.C. § 15b, for civil RICO claims. *Id.* at 152, 107 S.Ct. 2759; *see also Rotella v. Wood*, 528 U.S. 549, 553, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). In *Klehr v. A.O. Smith Corporation*, the Supreme Court rejected the theory that the statute of limitations in civil RICO cases began to run anew upon each predicate act forming part of the RICO claim. 521 U.S. 179, 189, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997). And in *Rotella*, the Supreme Court rejected the plaintiff's contention that the statute of limitations in a civil RICO action accrues when "the claimant discovers, or should discover, both an injury and a pattern of RICO activity." *Rotella*, 528 U.S. at 553–54, 120 S.Ct. 1075. The Court left open at least two possibilities for when a civil RICO claim accrues: the date when a plaintiff discovers or should have discovered her injury, or the date when the injury occurs. *See id.*, 528 U.S. at 553–54 & n. 2, 120 S.Ct. 1075; *see also Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 245 (3d Cir.2001) (analyzing *Rotella*). The Eighth Circuit, which adopted the "pattern discovery rule" prior to the Court's rejection of that rule in *Rotella*, has not yet determined which of the two remaining options applies. *See Granite Falls Bank v. Henrikson*, 924 F.2d 150, 154 (8th Cir.

---

**3.** Normally, the Court does not consider documents outside the pleadings on a motion to dismiss. In this case, however, Bendzak herself cites the attached copies of the policies in her Resistance. Because the policies are "undisputedly authentic document[s]" that are a source of Bendzak's claims, the Court will

consider them in ruling on Midland's Motion to Dismiss. *See Parnes*, 122 F.3d at 546 n. 9 (considering prospectus where plaintiff's claims were based upon the prospectus, even though the prospectus was not attached to the complaint).

1991) (adopting pattern discovery rule), *abrogated by Rotella*, 528 U.S. at 553–54, 120 S.Ct. 1075. Other district courts in the Eighth Circuit have concluded that the civil RICO limitations period begins to run when a plaintiff discovers or should have discovered the injury that underlies her cause of action. *See Misischia v. St. John's Mercy Health Sys.*, No. 4:04–cv–1161, 2005 WL 1875035, at *7 (E.D.Mo. Aug. 5, 2005); *Heaven & Earth, Inc. v. Wyman Props. Ltd. P'ship*, No. Civ. 03–3327, 2003 WL 22680935, at *5 (D.Minn. Oct. 21, 2003); *Wal–Mart Stores, Inc. v. Watson*, 94 F.Supp.2d 1027, 1033 (W.D.Ark.2000).

 In light of the Eighth Circuit's pre-*Rotella* ruling adopting the pattern discovery rule, and in light of *Rotella* itself, which discussed the injury discovery rule at some length, the Court will apply the injury discovery rule in this case. *See Rotella*, 528 U.S. at 555, 120 S.Ct. 1075; *Granite Falls Bank*, 924 F.2d at 154. Under the rule as it is described in *Rotella*, "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Rotella*, 528 U.S. at 555, 120 S.Ct. 1075. The discovery rule employs both a subjective and an objective inquiry. The Court must ask whether the plaintiff actually knew of her injury, and also, using a reasonable person standard, whether she should have known. *See Great Rivers Coop. of Se. Iowa v. Farmland Indus., Inc.*, 120 F.3d 893, 896 (8th Cir.1997).

 Midland contends that Bendzak knew or should have known about her injury on the dates that she purchased each deferred annuity policy. Midland cites Bendzak's Complaint, which states that Bendzak "was harmed by the *purchase* of Midland deferred annuities...." Compl. ¶ 22 (emphasis added). Midland also argues that Bendzak fully knew the contract terms at the time of purchase, and therefore should have known of any

resultant injury. Def.'s Br. at 12. Bendzak, on the other hand, argues that the very fact that she purchased multiple deferred annuities indicates that she did not know of her injury upon purchasing each one. Construing the facts in favor of the plaintiff, Bendzak has alleged facts sufficient to support her argument that she did not know of her injury, as a subjective matter, at the time she purchased each annuity.

The next question for the Court is whether Bendzak should have known of her injury on the date of purchase for each annuity. A number of federal courts have applied already-existing inquiry notice rules, or slightly modified inquiry notice rules, to limitations questions in RICO cases where some type of fraud is alleged. *See, e.g., KCI Mgmt. Corp. v. Posternak, Blankenstein & Lund, LLP*, —— Fed. Appx. ——, ——, 2006 WL 1735284, at *1 (4th Cir.2006); *Sims v. Ohio Cas. Ins. Co.*, 151 Fed.Appx. 433, 2005 WL 2508567, at *2 (6th Cir.2005); *Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 359 F.3d 226, 238 (3d Cir.2004) (noting that to equitably toll the running of a limitations period, plaintiffs must have exercised "reasonable diligence" to discover their claim); *Mathews*, 260 F.3d at 250 (adopting inquiry notice rule for RICO claim alleging securities fraud); *Pincay v. Andrews*, 238 F.3d 1106, 1110 (9th Cir.2001). In this case, the Court will look to the Eighth Circuit's own inquiry notice rule, which is set forth in *Great Rivers Coop.*, 120 F.3d at 896; *see also Ritchey v. Horner*, 244 F.3d 635, 639 (8th Cir.2001).

 The Eighth Circuit has held that "inquiry notice exists when there are 'storm warnings' that would alert a reasonable person of the possibility of misleading information, relayed either by an act or by omission." *Great Rivers Coop.*, 120 F.3d at 896. Although it is often inappropriate

to decide the issue of inquiry notice on a motion to dismiss, doing so may be proper in a given case. *Dutton v. D & K Health-care Res.*, No. 4:04–cv–147, 2006 WL 1778863, at *2 (June 23, 2006). "The determination of whether inquiry notice exists is an objective standard based upon the facts known to the victim." *Great Rivers Coop.*, 120 F.3d at 896. As such, the Court must determine the following: (1) the facts of which Bendzak was aware; (2) whether a reasonable person with knowledge of those facts would have investigated the situation further; and (3) upon investigation, whether that reasonable person would have acquired actual notice of the alleged misrepresentations. *Id.*

Midland argues that, as a matter of law, Bendzak fully knew the terms of each annuity at the time of purchase. In the securities fraud context, the Eighth Circuit has held that when an investor receives written information that contradicts oral statements made by the seller of the security, that information may be considered a "storm warning" for purposes of the inquiry notice standard. *See Davidson v. Wilson*, 973 F.2d 1391, 1401–02 (8th Cir.1992); *Koke v. Stifel, Nicolaus & Co., Inc.*, 620 F.2d 1340, 1343 (8th Cir.1980) (concluding that confirmation slips and monthly account statements were sufficient to require a reasonable person to ask questions, even though they were "not a model of clarity for the novice investor"). Similarly, in *Mathews*, the Third Circuit held that "investors are presumed to have read prospectuses, quarterly reports, and other information relating to their investments. *Mathews*, 260 F.3d at 252. The court added: "This comports with the general purpose of civil RICO to encourage plaintiffs to actively investigate potential criminal activity, to become 'prosecutors, private

attorneys general, dedicated to eliminating racketeering activity.'" *Id.* (quoting *Rotella*, 528 U.S. at 557, 120 S.Ct. 1075).

The Court concludes that Bendzak knew or should have known the terms of each policy on the date of purchase, since those terms were in the written policies themselves and Bendzak does not contest Midland's assertion that she had access to, or copies of, the policies. The information that Bendzak knew includes the maturity date for each policy, which is not buried in fine print, but is clearly printed on the "specifications page" of each policy.[4] Each policy also contained information about the relevant surrender charges. *See* Attachments to Clerk's No. 14. However, the Court will not assume that Bendzak knew the implications of the maturity date and the other terms in the policy, particularly in light of her allegation that Midland "intentionally and fraudulently misrepresent[ed] the true nature of the deferred annuity products" that it marketed to senior citizens. Construing the facts in Bendzak's favor, the Court concludes that Bendzak was aware of the language in each policy, but was not necessarily aware of its meaning.

The next question for the Court is whether a reasonable person with knowledge of the facts—in this case, most notably the maturity date and surrender charges—should have inquired further. As the Supreme Court has observed, "[t]he prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask." *Rotella*, 528 U.S. at 556, 120 S.Ct. 1075 (quoting *United States v. Kubrick*, 444

4. The Court recognizes that the clarity of the print in the policy is a factual question best left to a jury. Nonetheless, the Court must

conclude that, as a matter of law, Bendzak was on notice of the information contained in her printed policies.

U.S. 111, 122, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979)). In light of the case law indicating that confirmation slips and other written documents constitute storm warnings, the Court can only conclude that a reasonable person should have made further inquiry upon reading the maturity date in the policy. *See Davidson*, 973 F.2d at 1402; *Koke*, 620 F.2d at 1343; *see also Pincay*, 238 F.3d at 1110; *Prieto v. John Hancock Mut. Life Ins. Co.*, 132 F.Supp.2d 506, 521 (N.D.Tex.2001). Bendzak does not state that she did inquire further upon reading the policies, or that she undertook any form of investigation upon receiving the policies. *See Mathews*, 260 F.3d at 252 (concluding that once the defendants establish the existence of storm warnings, the burden shifts to the plaintiff to indicate that she exercised reasonable due diligence and yet was unable to discover her injuries).

The Court's conclusion is bolstered by the Supreme Court's decision in *Klehr*, 521 U.S. at 194, 117 S.Ct. 1984. In *Klehr*, the Supreme Court held that in the context of civil RICO, "a plaintiff who is not reasonably diligent may not assert 'fraudulent concealment' " in order to toll the statute of limitations. *Klehr*, 521 U.S. at 194, 117 S.Ct. 1984. In so holding, the Court observed that private civil RICO actions "seek not only to compensate victims but also to encourage those victims themselves diligently to investigate and thereby to uncover unlawful activity." *Id.* at 195, 117 S.Ct. 1984. This decision, along with the Court's decision in *Rotella*, puts the onus on the plaintiff to seek to identify the cause of her injury in a diligent manner. *Id.; see also Rotella*, 528 U.S. at 561, 120 S.Ct. 1075.

Bendzak contends that the diligent investigation requirement should be waived where the plaintiff alleges a fiduciary relationship together with an allegation of fraudulent concealment. Bendzak cites this Court's decision in *Grove v. Principal Mutual Life Insurance Company*, 14 F.Supp.2d 1101 (S.D.Iowa 1998). Unlike the plaintiff in *Grove*, whose complaint included a claim for breach of fiduciary duty, Bendzak's Complaint does not allege that a fiduciary relationship existed between Bendzak and Midland. Even if the Court could glean an allegation of a fiduciary relationship from the facts stated in Bendzak's Complaint, it is not clear that the law in *Grove* can be transferred to the civil RICO context. In *Grove*, this Court applied Iowa law to determine whether the plaintiff's state law claim for fraud was time-barred. *Grove*, 14 F.Supp.2d at 1108. Citing cases from the Iowa Supreme Court, the Court noted that the plaintiff's allegation of a fiduciary relationship, combined with the allegation that the defendant failed to reveal facts it was under a duty to disclose, were sufficient to meet the requirements of the fraudulent concealment doctrine under Iowa law. *Id.* at 1109; *see also DeRance, Inc. v. Paine-Webber, Inc.*, 872 F.2d 1312, 1321 (7th Cir.1989) (reviewing a jury instruction based on Wisconsin law). Given the United States Supreme Court's emphasis on the plaintiff's obligation to investigate potential claims in *Klehr*, it is questionable whether the "fiduciary relationship" exception is available in civil RICO cases. *See Pincay*, 238 F.3d at 1109 (holding that constructive notice of the injury, via written disclosures, begins to run the statute of limitations in a civil RICO case regardless of whether a fiduciary relationship exists, and that fraudulent concealment will not toll the limitations period where the plaintiff is on constructive notice of the facts and fails to investigate). This, combined with the fact that Bendzak has not pled a fiduciary relationship, counsels against applying such an exception here.

Finally, the Court can see no other equitable tolling doctrine that would merit toll-

ing the statute of limitations in this case.[5] In *Rotella*, the Supreme Court noted that equitable tolling is available in civil RICO cases, stating: "[w]here a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it, equitable tolling may be one answer to the plaintiff's difficulty." *Rotella*, 528 U.S. at 561, 120 S.Ct. 1075. But this statement, like the Court's other cases in this area, emphasizes the need for the plaintiff to seek to discover her injury once she has notice of it. While barring the action at this early stage based on the statute of limitations produces a harsh result, the Supreme Court has made it clear that district courts should not toll the statute of limitations in a civil RICO action where a plaintiff has not exercised diligence in the discovery of her injury. *See id.* at 556, 120 S.Ct. 1075. Because Bendzak did not seek to discover her injury once she had notice of it, her RICO claim is time-barred as to the first seven of the eight policies that she purchased.

### 2. *Statute of limitations for Bendzak's conspiracy claim.*

 Midland next argues that Bendzak's conspiracy claim is time-barred as to the first seven of the eight annuity policies that she purchased. Bendzak's Complaint may fairly be read to contain two conspiracy claims: conspiracy to violate civil RICO under 18 U.S.C. § 1962(d), and conspiracy to engage in unfair competition under state law.[6] *See* Compl. ¶ 52. The Court will first address the statute of limitations

for the civil RICO conspiracy claim, and will then move on to the remaining state law claims. Under 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire to violate" any RICO provision. 18 U.S.C. § 1962(d). Like the statute of limitations under the other civil RICO provisions, the statute of limitations for civil RICO conspiracy claims is four years. *See Hodas v. Sherburne, Powers & Needham, P. C.*, 938 F.Supp. 60, 65 (D.Mass.1996). Moreover, the analysis for civil RICO conspiracy claims is the same as that for civil RICO claims brought under 18 U.S.C. § 1962(c). *See id.* For the reasons discussed above, Bendzak's civil RICO conspiracy claim, if there is one, is time-barred as to the first seven of the eight annuities she purchased.

 Bendzak's Complaint also alleges violations of the common law of civil conspiracy, with unfair competition as the underlying tort. Compl. ¶ 52. Before analyzing whether this claim has expired, the Court must consider which state's laws apply. Federal district courts must apply the choice-of-law rules of the forum state, whether sitting in diversity or deciding federal question cases with supplemental state law claims. *DCS Sanitation Mgmt., Inc. v. Casillo*, 435 F.3d 892, 895 (8th Cir.2006); *Cole v. Wells Fargo Bank, N.A.*, No. 437 F.Supp.2d 974 n. 5 (S.D.Iowa 2006). The Iowa Supreme Court has adopted the Second Restatement of Conflicts to govern choice-of-law questions. *Cole v. State Auto. & Cas. Underwriters*,

---

5. Bendzak contends that, under Iowa law, allegations of fraud toll the statute of limitations. Bendzak cites *Cunningham*, 42 F.Supp.2d at 892. As discussed at length above, the RICO statute of limitations may only be tolled due to an allegation of fraud where the plaintiff is diligent in discovering her injury. Moreover, *Cunningham* was decided before *Rotella* and does not contain a discussion of the Supreme Court's cases in this area. In fact, it is not clear whether the statute of limitations question in *Cunningham*

pertained to the plaintiffs' RICO claim, or just to the state law claims.

6. Count II of Bendzak's Complaint is entitled "Common Law Civil Conspiracy," which may indicate that she does not allege a conspiracy to violate civil RICO, as it is a statutory cause of action. However, Bendzak's Complaint can be read to assert a claim for conspiracy to violate civil RICO, *see* Compl. ¶ 52, and the Court will construe the Complaint liberally at this early stage in the litigation.

296 N.W.2d 779, 781 (Iowa 1980). The choice of law for a civil conspiracy claim is governed by the "most significant relationship" test. *Am. Online, Inc. v. Nat'l Health Care Discount, Inc.*, 121 F.Supp.2d 1255, 1269 & n. 11 (N.D.Iowa 2000). Under this test, the Court must consider: the place where the injury occurred, the place where the conduct causing the injury occurred, the place of domicile, residence, incorporation or business of the parties, and the place where the relationship between the parties is centered. *Id.* at 1269; *see also* Restatement (Second) Conflict of Laws § 145 (1971).

In this case, Bendzak resides in Ohio; however, her Complaint indicates that the proposed class of plaintiffs may be located in a large number of states. *See* Compl. ¶ 24. According to Bendzak's Complaint, Midland's annuity operations are located in Iowa. *Id.* ¶ 7. Bendzak's injuries occurred in Ohio, while the conduct causing the injury likely occurred either in Ohio, where Bendzak alleges she was a target of Midland's marketing, or in Iowa, where the business is located. The relationship between Bendzak and Midland is best characterized as being centered in Ohio, where all of Bendzak's contacts with Midland occurred. In sum, these factors do not point conclusively towards applying the law of a single state. Other relevant factors to consider include the needs of the interstate system, the relevant policies of the forum, the relevant policies of other interested states, the protection of justified expectations, the basic policies underlying the particular field of law, certainty and predictability, and ease in the determina-

tion and application of the law. Restatement (Second) Conflict of Laws § 6 (1971); *see Am. Online*, 121 F.Supp.2d at 1269. Here, two factors are of particular relevance. First, although Bendzak is in Ohio, the proposed class members will be scattered around the country, and many of them will not have any contacts with Ohio. Second, while Bendzak's injuries occurred in Ohio, Iowa has an obvious interest in regulating businesses that are incorporated in Iowa. On balance, the Court concludes that Iowa's statute of limitations should apply to Bendzak's common law civil conspiracy claim.

 Under Iowa law, the statute of limitations for conspiracy to commit a tort is the same as the statute of limitations for the underlying tort that furthered the conspiracy. *Cimijotti v. Paulsen*, 230 F.Supp. 39, 43 (N.D.Iowa 1964). As discussed above, Bendzak's Complaint alleges conspiracy to engage in unfair competition under state law.[7] Compl. ¶ 52. Under Iowa law, a common law claim for unfair competition is subject to a five-year statute of limitations. Iowa Code § 614.1(4); *Amana Refrigeration, Inc. v. Consumers Union of United States, Inc.*, 431 F.Supp. 324, 325 (N.D.Iowa 1977). Bendzak purchased each of her eight annuities between April 2001 and January 2002, and filed her Complaint on December 8, 2005. Thus, she filed her Complaint within Iowa's five-year statute of limitations for unfair competition. Her claim for conspiracy to engage in unfair competition, if there is such a claim, is timely.

7. Midland incorrectly asserts that Bendzak's only alleged tort is her RICO claim. Bendzak's Complaint states: "Midland and its Licensed Agents committed one or more overt acts in furtherance of this course of action, including engaging in racketeering activity in violation of RICO ... and engaging in unfair methods of competition and/or unfair or deceptive acts in violation of Iowa (and similar sister state) statutes...." Compl. ¶ 52. Under Iowa law, a plaintiff may assert a claim for conspiracy to engage in unfair competition. *See generally Basic Chems., Inc. v. Benson*, 251 N.W.2d 220 (Iowa 1977).

## C. RICO Pleading Requirements

Midland next argues that Bendzak's RICO claim should be dismissed because she has not adequately alleged a claim for mail or wire fraud, and because she does not allege the existence of an "enterprise." Before considering Midland's pleading arguments, the Court will examine whether Bendzak could possibly prevail on her RICO claim in light of the fact that the statute of limitations has run with respect to seven of the eight annuities she purchased.

### 1. Can Bendzak prevail in her RICO claim despite the fact her claim is time-barred with respect to all but one annuity?

"To establish a RICO violation, a plaintiff must allege and prove (1) the existence of an enterprise; (2) defendant's association with the enterprise; (3) defendant's participation in predicate acts of racketeering; and (4) defendant's actions constitute a pattern of racketeering activity." Sinclair v. Hawke, 314 F.3d 934, 943 (8th Cir.2003) (citations omitted). Having decided that the statute of limitations has run with respect to all but one of the annuities Bendzak purchased, the Court must decide whether the allegations in her Complaint, read only with respect to one annuity, are sufficient to meet the "pattern" requirement. The Court concludes that they are, at least at this early stage in the litigation.

In H.J. Inc. v. Northwestern Bell Tel. Co., the Supreme Court examined the "pattern" requirement in civil RICO cases. 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The Court observed that "pattern" is not defined in the RICO statute, and endeavored to clarify its meaning. After examining the statute's legislative history, the Court concluded that the pattern requirement can be fulfilled by proving "that the racketeering predicates are relat-

ed, and that they amount to or pose a threat of continued criminal activity." Id. at 239, 109 S.Ct. 2893 (emphasis in original). The Court explained that the two requirements—relatedness and continuing racketeering activity—are subject to a flexible interpretation. Id. at 241, 109 S.Ct. 2893. More importantly for this case, the Court rejected the notion that a single fraudulent scheme is never enough to support a RICO claim. Id. at 241–42, 109 S.Ct. 2893. The concurring members of the Court agreed with the majority on this point, noting that "nothing in the statute supports the proposition that predicate acts constituting part of a single scheme (or single episode) can never support a cause of action under RICO." Id. at 256, 109 S.Ct. 2893 (Scalia, J., concurring); see also Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank, 934 F.2d 976, 980 (8th Cir.1991) (observing that "a single scheme can constitute a RICO claim" if it meets the requirements of relatedness and continuity).

Having briefly outlined the "pattern" requirement, the Court will turn to the question of whether Bendzak's RICO claim is viable, considering that her suit is timely as to only one of the eight annuities that she purchased. As discussed above, the Supreme Court rejected the theory that the statute of limitations in civil RICO cases began to run anew upon each predicate act forming part of the RICO claim in Klehr. Klehr, 521 U.S. at 189, 117 S.Ct. 1984. Using the Clayton Act, 15 U.S.C. § 15b, as an analogy, the Court observed that "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." Id. But the Court observed, apparently approvingly, that under the rule in some circuits, the plaintiff may "point to new predicate acts that took place after [the accrual date]." Id. Thus, while Bend-

zak may not recover for any injuries that occurred more than four years before she filed her Complaint, it is possible that she may recover for the later injury. To support her RICO claim, Bendzak has pled predicate acts of mail fraud and wire fraud, including the allegedly fraudulent marketing or sale of living trust forms; processing applications for deferred annuities; issuing age waivers; processing premium payments; payment of sales commissions; and processing penalties and surrender charges. It is these predicate acts—not the injury itself-that Bendzak must prove in order to satisfy the "pattern" requirement. *See generally Handeen v. Lemaire*, 112 F.3d 1339, 1353 (8th Cir.1997). Accordingly, it would be inappropriate to dismiss Bendzak's RICO claim entirely at this early stage of the litigation for the sole reason that she cannot recover for injuries caused by her purchase of the first seven annuities.

### 2. Has Bendzak met the requirements of Rule 9(b)?

The Court next turns to Midland's assertion that Bendzak's RICO claim should be dismissed because she has not adequately alleged a claim for mail or wire fraud. Midland's argument is based on Federal Rule of Civil Procedure 9(b), which states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). Midland contends that Bendzak has not pled fraud with sufficient particularity because her Complaint does not allege the time, place, or contents of any of the allegedly false representations by Midland. Midland also contends that Bendzak has failed to identify any misrepresentation or concealment.

Midland correctly states that Rule 9(b) applies to allegations of mail fraud and wire fraud when used as predicate acts for a civil RICO claim. *See Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1069 (8th Cir. 1995). The "circumstances of fraud," as the term is used in Rule 9(b), "include such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Murr Plumbing*, 48 F.3d at 1069. Despite this heightened pleading requirement, Rule 9(b) must be read in conjunction with the more liberal pleading standard in Rule 8. *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir.2001). As the Eighth Circuit has observed, "[t]he special nature of fraud does not necessitate anything other than notice of the claim; it simply necessitates a higher degree of notice, enabling the defendant to respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct." *Id.*

The Court will begin with Midland's contention that Bendzak's Complaint has not identified any misrepresentation or concealment. Bendzak's RICO claim is predicated on alleged acts of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. These offenses "consist in the foreseeable use of the mails or wires for the purpose of carrying out a scheme to defraud." *Abels*, 259 F.3d at 918. Neither offense requires that a plaintiff plead that the defendant made misrepresentations of fact. *Id.* "Because misrepresentations of fact are not necessary to the offense, it follows that no misrepresentations need be transmitted by mail or wire: even routine business communications in these media may suffice to make a scheme of false dealing into a federal offense." *Id.* Because it is not necessary to plead misrepresentations of fact, the Court will not

dismiss Bendzak's RICO claim on the basis that she has not identified any misrepresentation or concealment.

The next question for the Court is whether Bendzak's Complaint is inadequate because she has not pled "the who, what, when, where and how." *Parnes*, 122 F.3d at 550 (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990)) (discussing what is required under Rule 9(b)). In describing the alleged fraud that took place, Bendzak states:

> Many of the precise dates of Defendant Midland's uses of the U.S. mails and interstate wire facilities (and corresponding acts of mail and wire fraud) have been deliberately hidden and cannot be alleged without access to the Defendant's books and records. Indeed, an essential part of the successful operation of the scheme to target senior citizens for inappropriate deferred annuity products depended on secrecy, and the Defendant withheld details of the scheme from the Plaintiff and members of The Class. Generally however, Plaintiff can describe the occasions on which the predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme. They include thousands of communications to perpetuate and maintain the scheme throughout the Class Period, including, *inter alia:* (i) funding of the marketing and/or sale of the living trust forms; (ii) processing of applications for deferred annuity products; (iii) issuing age waivers for applicants over 65 years of age; (iv) processing premium payments; (v) payment of commissions for sales of deferred annuity products; and (vi) processing penalties and "surrender charges" for early access to funds trapped in the deferred annuity products.

Compl. ¶ 38. Bendzak also alleges that "Defendant Midland's pattern of racketeering activity likely involved thousands of separate instances of use of the U.S. Mails or interstate wire facilities in furtherance of its scheme to target senior citizen investors for inappropriate deferred annuity products." *Id.* ¶ 40.

In deciding this question, the Court is mindful that Bendzak has not yet had an opportunity to undertake discovery in this case. *See Abels*, 259 F.3d at 921 (observing that "a court cannot reasonably expect highly specific allegations before allowing at least a brief discovery period"). The Court is also aware that, "[w]here a plaintiff is not a party to a communication, particularity in pleading may become impracticable." *Id.* This seems particularly true in a proposed class action such as this one, where the class has not yet been certified. Nonetheless, Bendzak's Complaint is devoid of any specific information about the "who, what, when, where, and how," particularly as those facts relate to Bendzak herself. While Bendzak generally alleges that "[t]he scheme begins with Midland's licensed agents marketing living trusts via seminars, meetings and in home visits used to encourage seniors to purchase living trusts and the sale of the living trusts," *see* Compl. ¶ 15, Bendzak does not state whether she ever attended such a seminar. Nor does she state whether she received any mail or telephone calls soliciting her business, or whether she engaged in any mail or telephone communications with Midland or its agents. Bendzak does allege that Midland's licensed agent, Edward J. Brzuski of Cleveland Senior's, sold the eight deferred annuities to her, but she does not state where, when, or how the sales occurred.[8] *See* Compl. ¶ 21. In this respect

---

8. Bendzak alleges that she purchased the annuities "[b]etween April 2001 and January 2002." Compl. ¶ 6. The issue date of each policy is notably absent from Bendzak's Com-

Bendzak's Complaint differs from the complaint that the Eighth Circuit held to be sufficient in *Abels*. In *Abels*, the complaint set forth "times and places of numerous meetings, marketing seminars, and private conversations." *Abels*, 259 F.3d at 920. The plaintiffs in *Abels* also attached exhibits to their complaint that included the dates and contents of the defendants' mail communications, which the court considered as incorporated into the pleadings. *Id. Cf. Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir.1982) (holding that allegations were not sufficiently particular to satisfy Rule 9(b) where they stated only that allegedly false statements were made in a "pamphlet," "promotional material," or "a typical life-care contract"). Here, Bendzak has not alleged a single date or location of any communication that facilitated the alleged scheme to defraud, even with respect to her own purchase of the annuities. For this reason, Bendzak's Complaint does not satisfy Rule 9(b). Given that this is a Motion to Dismiss at an early stage in the case, and that no discovery has yet taken place, the Court will allow Bendzak ten days to amend her Complaint to satisfy the requirements of Rule 9(b). *See* Fed.R.Civ.P. 15(a) (stating that leave to amend shall be "freely given when justice so requires").

3. *Has Bendzak alleged a distinct enterprise?*

■■■■ Midland next argues that Bendzak's Complaint fails to allege an enterprise distinct from the pattern of racketeering, as required to make out a civil RICO claim. *See Bennett*, 685 F.2d at 1060. Midland also argues that the Complaint does not allege any conduct by Midland in furtherance of the enterprise's affairs, as opposed to its own affairs. Br. in

Supp. of Mot. to Dismiss at 18. An "enterprise" is defined by RICO as including: "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "The existence of an enterprise at all times remains a separate element which must be proved by the [plaintiff]." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). The Eighth Circuit has identified three characteristics possessed by all RICO enterprises: "(1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering." *Handeen*, 112 F.3d at 1351. Midland contends that Bendzak has not satisfied the third requirement.

■■■■ In determining whether an enterprise has an ascertainable structure distinct from that inherent in a pattern of racketeering, courts consider whether the enterprise would still exist if the predicate acts were removed from the equation. *Id.* at 1352. Bendzak alleges that the RICO enterprise in her case consists of associations in fact between Midland and Licensed Agents of Midland, such as Cleveland Senior's, which sold Bendzak her annuities. Compl. ¶ 30. Bendzak alleges that "Defendant Midland National Life Insurance Company is, and at all relevant times herein was, a stock insurance corporation which, since 1999, has been duly organized and existing under and by virtue of the laws of Iowa and authorized to transact and does transact the business of insurance." Compl. ¶ 7. Bendzak also alleges that Midland operates in 49 states through 12,000 licensed sales profession-

plaint, although the dates are present on the copies of the policies themselves, which Mid-

land attached to its Motion to Dismiss.

als, and describes the corporate structure of Midland as it relates to its parent company. *Id.* These allegations are sufficient to establish that Midland provides legitimate services and has an ascertainable structure apart from any alleged racketeering activity. *See Bennett,* 685 F.2d at 1060. Accordingly, Bendzak's Complaint adequately alleges an enterprise that satisfies the third characteristic of the enterprise description.

Midland also argues that RICO may not be applied to Midland just because Midland operates through agents. Midland relies on *Fitzgerald v. Chrysler Corp.,* a case in which the Seventh Circuit held that RICO could not be applied to a free-standing corporation—in that case, Chrysler—just because the corporation did business through dealers. 116 F.3d 225, 227 (7th Cir.1997) (observing that an employer and its employees cannot constitute a RICO enterprise). However, in *Fitzgerald,* the plaintiffs contended that Chrysler violated RICO by issuing extended warranties that provided less protection than promised. The court held that Chrysler, its dealers, and other subsidiaries did not constitute an enterprise, noting that "[t]he dealers were merely a conduit, and the trusts and foreign subsidiaries were not even that." *Id.* at 227. The court observed: "The dealers did not, by their incidental role in the alleged fraud ... lend an air of legitimacy to a person or entity that unless masked by a legitimate-seeming enterprise would be quickly discovered to be engaged in criminal acts." *Id.* at 227–28. The court wryly noted that "Chrysler has a *greater* appearance of probity than any automobile dealer." *Id.* at 228.

Here, Bendzak alleges that Midland's licensed agents worked in tandem with Midland to perpetuate the fraud by marketing deferred annuities to seniors. Compl. ¶ 14. Bendzak alleges that Midland's agents hold seminars in seniors' homes, senior centers, and other locations, and gather the seniors' financial information by convincing seniors to purchase a living trust so that the information can be used to market deferred annuities. *Id.* ¶ 15. Bendzak also alleges that Midland encourages its agents by offering high commissions for the sale of deferred annuities. *Id.* ¶ 17. The gravamen of Bendzak's Complaint is that seniors put their trust in the various agents, who then convince them to buy deferred annuities from Midland, despite the agents' knowledge of the inappropriate nature of such an investment. This is different from the situation where a consumer buys a Chrysler from a car dealer, who may or may not know that the manufacturer's warranty will provide less coverage than advertised, and in whom the consumer is likely to put very little trust. The Court concludes that Bendzak has sufficiently alleged the existence of a RICO enterprise.

### D. *Common Law Civil Conspiracy*

Midland next argues that the Court should dismiss Bendzak's common law civil conspiracy claim because Bendzak has failed to state a claim under RICO, the underlying act. As discussed above in Part IV.B.2, Bendzak's Complaint can fairly be read to allege a conspiracy to violated civil RICO, as well as a conspiracy to engage in unfair competition under Iowa law. And, as discussed above in Part IV. C.2, Bendzak has not pled wire fraud or mail fraud with sufficient particularity to satisfy Rule 9(b). If Bendzak is unable to amend her Complaint to satisfy Rule 9(b), her claim of conspiracy to violate civil RICO must be dismissed. However, her claim of conspiracy to engage in unfair competition under state law will remain, as there has been no motion to dismiss that claim.

## V. CONCLUSION

For the reasons discussed above, the Court concludes that Bendzak's Complaint does not interfere with state insurance regulation in violation of the primary jurisdiction doctrine or *Burford* abstention principles. The Court also concludes that Bendzak's RICO claim is time-barred as to seven of the eight deferred annuities that she purchased. Bendzak's claim for conspiracy to violate civil RICO is similarly time-barred as to the first seven annuities. However, Bendzak's claim for conspiracy to engage in unfair competition is not time-barred. The Court concludes that Bendzak has not pled mail fraud or wire fraud with sufficient particularity to satisfy Rule 9(b). Bendzak will be given ten days from the date of this order to amend her Complaint to plead fraud in a way that comports the requirements of Rule 9(b). If Bendzak does not so amend her Complaint, her RICO claim and her claim of conspiracy to violate civil RICO will be dismissed. Finally, the Court concludes that Bendzak's Complaint can fairly be read as alleging a claim for conspiracy to violate unfair competition under Iowa law, which remains part of her Complaint. Midland's Motion to Dismiss (Clerk's No. 14) is GRANTED in part and DENIED in part.

IT IS SO ORDERED.